Please the court, my name is Jaime Hossel and I represent the petitioner in this matter. The petitioner in this case was admitted to the United States on a K-1 visa, a fiancee visa, in 1996. He did not marry that individual who petitioned for him. Instead, he married another U.S. citizen in 1998. Which is beyond the 90-day deadline. Which is beyond the 90-day deadline and not the same petitioner on the K-1 visa. A visa petition from that U.S. citizen petitioner filed the visa petition as well as an adjustment application, a status application. The visa petition was approved, but the adjustment application, the green card application, was denied. The petitioner was placed in removal proceedings and on April 11, 2005, the immigration judge pre-terminated his applications for the green card application, the asylum application, the withholding, denied the withholding and conviction against torture claims. The petitioner sought an appeal to the Board of Immigration Appeals. That was subsequently denied. Within 30 days, he filed a petition for review with this court. In 2008, the petitioner then filed a motion to reopen with the Board of Immigration Appeals. That, too, was subsequently denied within 30 days. I think we're pretty familiar with the facts, Congressman. Okay. Thank you, Judge. What the issues are before this Court, what has developed is, does the Court have proper jurisdiction to determine whether or not an asylum application is properly pre-terminated because the applicant does not file the asylum application within one year of the date of its entry? Next is, did the immigration judge deny the petitioner's applications for withholding and conviction against torture because he had not yet converted to Christianity? Was that proper? And was it proper for the judge to pre-terminate the adjustment application? And lastly, did the Board of Immigration Appeals properly deny the motion to reopen? All right. Why don't you start with the adjustment of status issue? The adjustment of status application, to be quite candid, I believe is not the case. Isn't that covered by Calal? Calal is – it certainly addresses the issue regarding 245A adjustment as well as 245I adjustment. The only thing that Calal doesn't address, which was included in the petitioner's arguments, was the fraudulent activity. The Immigration and Nationality Act specifically includes a waiver under 212I of the Immigration Act for fraudulent activity, specifically in the procurement of a visa. So the petitioner's argument on that issue that he should be allowed for an adjustment application, but only in conjunction if he can prove the waiver requirements. The adjustment application, however, the issue only provides him a benefit of a green card. Truly, the issue that he's presented to the court is regarding the asylum application, the conviction against torture application, as well as the withholding, because if he returns to Iran, based on the apostasy that is at issue, he's sentenced to death. Does that tie into the adjustment of status? No, no, no. My only contention was that in reference to the adjustment of status application, his argument is that he should be allowed to proceed with it in conjunction with that 212I waiver, which would cover the fraudulent activity. Notwithstanding the fact that Calal says if you miss the 90-day deadline, you're out? Well, Calal never discussed the fraudulent activity of the individual if he never intended to marry the individual at all. In fact, I think Calal, the individual never married. No, she did subsequently marry. I apologize. But she never married the initial individual petitioner. That is correct. But it did not address any kind of remedial benefits provided by the act in reference to a 212I waiver. So this court would have to, in making the decision, either extend Calal to also include the inability of an applicant to also apply for a 212I waiver in conjunction with the adjustment, or carve up an exception to Calal, which is the applicant would be able to proceed over the adjustment of that 212I. Okay. What about the time bar with respect to the asylum application? It was over a year. Yes, Your Honor. All of you. What we're looking for, of course, is changed circumstances which would justify the delay. Right. And the change of circumstances, as well as the denial of the CAT claim and the withholding all necessarily involve the board's interpretation and the judge's interpretation of apostasy. That is the number one issue regarding all those issues. The immigration judge found that he had not yet converted to Christianity. The Board of Immigration Appeals also found he had not yet converted to Christianity. And all the applications, including the motion to reopen, that is the fundamental reason why they repeatedly deny his application. I didn't see any evidence that he, in fact, had converted to Catholicism. That is correct. He talked about it. That is correct. But that's it. There is no evidence in this record proceedings that he actually converted completely to Catholicism. But that's the whole argument. That's the argument that was presented to the judge, as well as the board, is that it's not necessary for conversion to be completed to Christianity or some other religion or even atheism. It's irrelevant. It is simply the leaving Islam. The blasphemy portion of it is that it's publicly known. But what is there in the record besides the fact that his parents were non-observant and at the moment, or at least at the relevant time, the most you could say he was non-observant. He had not published any kind of rejection of Islam. He just wasn't observing Islam. And that's not subject to persecution. I think I understand the question. It would appear that the way I interpreted the arguments for government counsel in that he was not a practicing Muslim at the time really becomes irrelevant. Whether an individual, for example, for Catholicism, goes to church, receives the body of Christ, is irrelevant. If they believe in the Holy Trinity, the Lord Jesus Christ, that's their belief. So... Yeah, but the background here is whether he would be subject to persecution if he went back. Right. And now it becomes, what are the factors that have occurred in the case in which, on an objective or even a subjective level, people from the government of Iran would be able to say that he has left Islam? What he indicated to the court in the record of the proceedings is that in November of 2003, is when he began to go to Sunday Mass and go to study Christianity. The government argued that no apostasy occurred, but if it did, it would have happened when he had communication with his wife about what type of religion was going to be in the household. But those were private communications between husband and wife. It wasn't a public display as in going to church or studying Christianity or different religion. Well, I don't see how that helps your case, because the only way that he could possibly be subject to persecution back in his home country would be if it were publicly known that he was publicly rejecting Islam. There are lots of non-observant Muslims in the country who aren't bothered at all. And it would appear that, I have yet to find a case on point with the Ninth Circuit, but there was an interesting case in the Seventh Circuit called Best and Poor, and that really had a very similar approach in terms of facts and the legal analysis in that the individual had not yet converted to Christianity, and it's not an issue of whether or not that individual will be, well, the way they phrase it, I believe, is that in the minds of the Iranian government or the judicial parliament in Iran, whether or not he actually converted successfully to another religion is irrelevant. The fact that he is being prohibited from exercising his religion freedom in Iran, and the fact that there is a public display of his rejection of Islam throughout these entire proceedings, from 1998 until the present, is certainly publicly available evidence of his rejection of the Islam faith. Let me ask you a question. If someone is from Iran or Afghanistan, or, you know, fill in the blank, doesn't want to go back, is it your view that if they come to the United States and say, I reject Islam, I'm going to become a Muslim in the United States, that's all, really, they have to do? I don't have a lot of clients from Iran, so I don't know. I couldn't speak on the general terms. How about in general terms? I mean, isn't that really what... In a practical sense? Isn't that what you're saying? Yeah. In a practical sense, in fact, that's one of the key points that the Seventh Circuit indicated, is that even if in his heart of hearts he doesn't believe in Islam, as a side issue to try to stay in the United States, or stay the deportation, I think they actually use that language, it still goes to the fact that he's rejected the Islam faith. He's now committed the blasphemy that is needed in order to incur a death sentence in Iran, and that's the reality in a practical sense. So, in a nutshell, if an individual did come from Iran and said, you know what, I don't believe in the Islam faith anymore, and actually the public displayed it, it's irrelevant if he actually didn't mean it. I mean, if a client came to your office and said, I'm from Iran, I don't want to go back, you would be well advised to tell the client, well, convert to Catholicism, wouldn't you? I wouldn't advise it. I just... I mean, that would be good advice to give somebody who doesn't want to go back. Just say, I want to become a Catholic, and then you get to stay. Isn't that the way it would work, if you're right? No. I certainly would advise a client to do that, unless he told me, because part of my intake, she would have asked, what's your religious background? What's your faith? Let's not personalize it to you. Wouldn't that be a way to be able to stay in the country? Just say, I'm from Iran, I want to become a Catholic. Give me my green card. Isn't that really... If it wasn't truthful, I think it would be unethical for any individual to advise such a thing. Okay, well, then the judge here says, well, you know, you keep talking about converting, but you haven't converted. And that's the whole point again. It's not necessarily... He's having an internal struggle with his beliefs, whether it's a rejection of Islam, that's clear. Whether it's Christianity or some other faith, that's his own internal struggle. But if he takes him five years, ten years to convert to Christianity or Christian, or to finally come up with his mind and say, you know what, I'm going to become an atheist, it doesn't matter. The apostasy occurred, and that was by leaving the Islam faith. If there's any other questions, I reserve my time. You may reserve your time, counsel. Thank you, Judge. We'll hear from the government. Good morning. May it please the Court. Sarah Vong on behalf of the Attorney General of the United States. In this case, Petitioner sought relief in the form of asylum and adjustment of status, neither of which is available to him. He sought relief or asylum on the basis of his apostasy. However, by his own admission, he did not practice Islam while he was in Iran. And he sought adjustment of status on the basis of his K1, I'm sorry, on the basis of his United States citizen spouse. However, she was not the spouse who petitioned for him to enter the country. Now, as to the adjustment of status argument, that's Kalal. Yes, Your Honor. All right. Anything further on that one? Just in response to counsel's arguments about the 212I waiver, Petitioner was never charged with fraud. And so the 212I waiver goes with the charge of, I believe it's 212A16, with the charge of fraud. And that has never been alleged in this case. He was charged with not having a valid document. Well, now what about the asylum apostasy issue? Yes, Your Honor. The government did argue in its brief that this court lacks jurisdiction to review the one-year bar issue. However, even under these law and facts, this is irrelevant because Petitioner never established that his circumstances had changed. Even if you do determine that they did change, he didn't file for asylum within a reasonable period of time. The agency found he didn't have changed circumstances because there seemed to be a lot of discussion with his wife about changing his religion. He researched it. They talked about it when they were dating, when they got married. But he never made steps to convert or even, not even necessarily to convert, but to turn his back on Islam. We don't know when this change occurred. Petitioner's counsel stated that private statements with his wife don't constitute apostasy. We just don't know when he would have turned his back on Islam and when he would have taken concrete steps. Suppose, in fact, he had gone through to baptism, formal conversion to Catholicism. What difference would that make with respect to asylum? The immigration judge had to look at the conduct of Petitioner before him. And while the government's not arguing that we need to be determining the legitimacy of one's religion... Well, assume it's sincere. We do look at conduct. And yes, in that case, he would have changed to Christianity. All right, but does that constitute apostasy within the meaning of this discussion? I believe so. So that would be grounds for asylum? In other words, if he had formally converted to another religion? Yes, Your Honor. And assuming good faith here? Correct, assuming good faith. And showing, meeting his burden to show that were he to return to Iran, he would continue practicing that religion. What did you mean by assuming good faith in answer to Judge O'Scanlan's question? Would the IJ have to decide that the person really did in his heart want to become a Christian? I don't think the immigration judge would need to decide whether the person in his heart... I don't know if any immigration judge could determine that. So what did you mean by you converted good faith as opposed to just converted? I guess good faith means, in response to your previous questions about, can a person just come here and decide to try to get asylum by becoming Christian? I just don't understand how that can work. If you could automatically come from a Muslim country and say, I'm going to be a Christian, or better yet, if you really don't want to go back, I'm going to be a Jew, you know, that's the end of the ballgame, isn't it? It seems to me, and again, we're looking at conduct, and so I guess maybe good faith or not, if you are taking the steps and you convert, you become baptized, you attend church and you appear to have turned your back on Islam, and were you to go back to Iran and continue with these beliefs, then yes, the country conditions do show that apostates, true apostates, could face the death penalty or any other penalties. In this, that's not the case before us, however. Petitioner did not practice Islam when he was in Iran. He came to the United States, we're unsure, when he began to convert or to change his beliefs or turn his back on Islam in the United States. His mother and brother remain in Iran and are not practicing Muslims, and he testified that they have not faced any problems either. So under, assuming, if we look and say the one-year bar is out, under the more likely than not standard, he has not met his specific burden of showing that it would be more likely than not that he himself would face persecution in Iran because of apostasy. Looking also at the country conditions, the 2007 country report, which was submitted with the motion to reopen, does show that no one was killed in Iran for apostasy. That's at page 39 of the record. And also it shows that there are about 100,000 converted Muslims who have converted to Christianity in Iran. So petitioner in this case has simply not presented proof to the agency that he himself would go back, would become a practicing Catholic, would perform those outward displays of Christianity that would bring persecution upon him or torture by the Iranian officials. Turning to the motion to reopen, the board did not abuse its discretion in denying this motion to reopen. Petitioner did not submit new evidence, nor has he shown that there was a material change in the law. He presented a proposed amendment. There's no evidence that this proposed law was ever... Assume it was actually passed. Would that make a difference? No, I don't think so. The basis of his asylum claim originally was that apostates are killed under Sharia law. And so by simply making it official, the punishment would be the same. He also did not show a prima facie case that he would be eligible. He presented no more evidence of his inversion or of any further steps taken to become a Christian. Or any statements that were, he returned to Iran. He would continue practicing and bring himself to detention. Is it against the law in Iran if you renounce the Islamic religion? It is against Sharia law in Iran to renounce the Islamic religion. Hypothetically, if this petitioner were removed and arrived in Iran, and he were asked, have you renounced Islam? And he said yes, what would happen to him? I'm not sure based on this record. And that's the evidence that petitioner did not present. What would happen to an apostate in Iran? The documents show evangelical Christians. There's anecdotal evidence about evangelical Christians being targeted. Jews, as you stated. But we don't have any specific evidence that would show just, I guess, your run-of-the-mill apostate who is not proselytizing or, I don't know, going out and trying to convert others. What would happen to him? But it does violate the law there now if you are an apostate. Yes, Your Honor. It appears to violate Sharia law. And there is the proposed law, which I'm not sure if that's been enacted or not. May I ask you the same thing I asked the other government lawyer? Do you know whether our relations with Iran are such that people are actually in practice being removed to Iran now? I am not sure of that. And I can contact DHS and discuss with them what their current actions are. Would you mind doing that? I don't mind doing that at all. And let the court know. I'm unsure of that at the moment. So in summary, Petitioner has not met his burden to show that he is an apostate or that he would be persecuted were he to return to Iran. He also has not shown that he's eligible for adjustment of status based on his entry on the K-1 visa. And the motion to reopen did not present any evidence that was new or material. If there are no more questions. No further questions. Thank you, counsel. Also, you have a few minutes reserved. Thank you, sir. With respect to a couple of issues that the government counsel has explored, we do know what the facts are. We do know, based on the record of proceedings, when there was an affirmative step, a public display of Petitioner joining Catholicism or at least learning about it and attending school as well as Sunday services. And that was in November of 2003. He then continues until September of 2004. And by then, the asylum application had already been filed. So we're essentially talking months between the time that he's publicly displayed his ability or willingness to attend and reject Islam for Christianity. And he's already filed his asylum application. With respect to the apostasy, again- Let me just say, I see all of that in the record, that he's seriously considering a potential conversion. But I don't see anything in the record where he rejects Islam as such. I think that also goes into whether or not his mother and sibling were affecting problems in Iran as well, because they're not practicing Muslims. But there's no evidence that anything's happening to them. Right. And I think that's the whole point, is that he has demonstrated, he's publicly displayed his willingness to go to church, to explore Christianity by studying it. Those are the communications that he did have with his wife, where the wife does understand that he's converting over. So what you're saying is the private thinking, the private conversations is enough. In conjunction with the objective evidence of him publicly displaying it, by attending school and by going to mass. Those are the public displays that he is following one religion over another. And what are we to assume in terms of the authorities in Iran? Would they be aware of that? Is he under surveillance by the Iranians that would disclose that he's doing this? I have no evidence to suggest to the court that he's under suspicion of any kind of activity, or that he would be under suspicion. It is a matter of what happens when it does happen. And he's subject to a sentence of death. Also in reference to the U.S. State Department, although it indicated that there was an unknown number of execution or deaths, specifically for purposes of apostasy, it does specifically indicate that there were 298 executions for unfair trials. Unfair trials included narcotics trafficking, political dissidents, but also for apostasy. So I would note that for the record as well. If there's no other questions, I'll submit to the court. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn.
judges: Alarcon, O'scannlain, Silverman